SANKEL, SKURMAN & MC CARTIN, LLP
Attorneys for Banco Popular North America
750 Third Avenue, 29th Floor
New York, New York 10017
(212) 682-2288
Claudio Dessberg (CD-0873)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
In re:                                                          Hearing Date: January 19, 2011
    CAROL W. NEWKIRK,                               Time: 10:00 a.m.

                      Debtor.                         Chapter 11

                                                        Case No.:10-15261 (BRL)
------------------------------------------------------------X

**APPLICATION OF BANCO POPULAR NORTH AMERICA
FOR AN ORDER GRANTING RELIEF FROM THE
AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362(d), OR,
IN THE ALTERNATIVE, DISMISSING BANKRUPTCY CASE
PURSUANT TO 11 U.S.C. § 1112(b)**

**TO THE HONORABLE BURTON R. LIFLAND
UNITED STATES BANKRUPTCY JUDGE**

        1.    Secured creditor Banco Popular North America (the "Bank"), through counsel, respectfully submits this application for an Order granting relief from the automatic stay pursuant to 11 U.S.C. § 362(d) so that the Bank can conclude its foreclosure sale of certain commercial real property purportedly owned by the debtor and debtor-in-possession Carol W. Newkirk, ("Debtor"). In the alternative, the Bank requests an Order dismissing this bankruptcy case as a bad faith filing and based on other factors enumerated in Bankruptcy Code § 1112(b).

2. This bankruptcy case involves the now typical scenario of a debtor filing for relief under Chapter 11 of the Bankruptcy Code on the verge of the judicial foreclosure of its real estate asset. In this case, this particular Debtor was also on the verge of finally being punished for contempt of court due to her repeated, willful and ongoing violations of numerous Orders issued by the Honorable Marcy Friedman of the New York State Supreme Court for the County of New York.

3. As set forth in greater detail below, in the case at bar the Bank is the holder of a duly recorded first and second mortgage executed in favor of the Bank by Zingarella Realty Corp. ("Zingarella Realty"), the former owner of certain premises which Debtor now claims to own. These mortgages have now been in default for almost <u>four years</u>.

4. Debtor claims to be the current owner of the mortgaged premises, having obtained title to the premises by transfer of the deed from her son Mr. Paul Quantano, who in turn obtained the deed to the premises by virtue of a "default judgment" for specific performance which directed Zingarella Realty to transfer said deed to Mr. Quantano. Both of these transfers of title took place after the Bank commenced its foreclosure action in New York State Supreme Court. The circumstances of Debtor becoming the purported owner of the mortgaged premises are extremely suspect, if not outright fraudulent. Among other things, and without limitation, one of the principals of the former Zingarella Realty has filed a sworn Answer with Counterclaims in an unrelated state court action attesting that he never agreed to sell the mortgaged premises to Debtor's son, Mr. Quantano, and that his signature on the purported Contract of Sale was counterfeited.

5. The Bank commenced foreclosure proceedings in July of 2007, and after extensive delay tactics and numerous frivolous "defenses" and "counterclaims" raised by Debtor, all of which were dismissed by the state court, a final Judgment of Foreclosure and Sale was finally signed by the Honorable Marcy Friedman in September of 2010. On October 7, 2010, the same day that the Bank was attempting to have the Judgment Clerk calculate the Bill of Costs and enter the Judgment, Debtor filed this bankruptcy case.

6. In addition, throughout the state court foreclosure proceedings, Debtor has wilfully and repeatedly violated the state court's Receivership Order, and various subsequent Orders and directives of Judge Friedman, and has repeatedly frustrated and interfered with the Receiver's attempts to gain access to the mortgaged premises, collect rents, lease and manage the premises, and otherwise perform her duties. Such conduct by Debtor necessitated two separate contempt proceedings by the Receiver. Debtor was scheduled to appear for a final contempt hearing before Judge Friedman on October 21, 2010, at which it was anticipated that penalties for contempt of court would finally be imposed on Debtor if she had still not provided the Receiver with access to the premises by October 12, 2010.

7. As further set forth below, since the filing of this bankruptcy case Debtor has engaged in various delay tactics, and has otherwise failed to comply with numerous provisions of the Bankruptcy Code – including, without limitation, failing to file Monthly Operating Reports, failing to attend the meeting of creditors, and failing to make various other disclosures and file various other documents as required by the Bankruptcy Code. It is respectfully submitted that there is no

reasonable possibility, or even any intention by the Debtor to reorganize in this case, and that the sole purpose of this bankruptcy filing is to further frustrate and delay a secured creditor's legitimate enforcement of its security interest in what is nothing other than a two-party dispute..

## THE PENDING FORECLOSURE ACTION

8. On or about September 10, 2003, for the purpose of evidencing a consolidated indebtedness in the amount of $4,150,000.00 and interest, Zingarella Realty duly executed and delivered a consolidated mortgage note to the Bank (the "2003 Note"). For the purpose of securing payment for the said 2003 Note, on or about September 10, 2003, Zingarella Realty executed and delivered to the Bank, as mortgagee, a certain consolidated mortgage (the "2003 Mortgage"), whereby Zingarella mortgaged to the Bank certain commercial real property located at 323 East 58th Street, New York, New York (the "Property").[1] True copies of both the 2003 Mortgage and the 2003 Note are annexed hereto as Exhibit A.

9. On or about July 29, 2004, for the purpose of evidencing an additional indebtedness in the amount of $300,000.00 and interest, Zingarella Realty duly executed, and delivered a mortgage note to the Bank (the "2004 Note"). For the purpose of securing payment for the said 2004 Note, on or about July 29, 2004, Zingarella Realty executed and delivered to the Bank, a second mortgage against the same Property (the "2004 Mortgage"). True copies of both the 2004

---

[1] The Property consists of a four-story structure having a large retail/commercial space on the ground floor, on a prime location in midtown Manhattan, and three small units which have been converted for residential use.

4

Mortgage and the 2004 Note are annexed hereto as <u>Exhibit B</u>.

10. Zingarella Realty defaulted under the 2003 Note, the 2003 Mortgage, the 2004 Note and the 2004 Mortgage by failing to pay the installments of principal and interest which became due on the 10th day of February 2007, and on the 10th day of each month thereafter. As a result, these mortgages have now been in default for <u>almost four years</u>, without a single payment having been made by either Debtor or Zingarella Realty.

11. As a result of the above defaults, the Bank accelerated the Mortgages and commenced a foreclosure proceeding on July 2, 2007 in the New York State Supreme Court, County of New York, known as <u>Banco Popular North America v. Zingarella Realty Corp, et al.</u>, Index No. 109089/07 (the "Foreclosure Action"). Following commencement of the Foreclosure Action, the deed to the mortgaged premises was somehow transferred to Debtor. Accordingly, the Bank duly served and filed a Supplemental Summons and Amended Complaint, adding Debtor to the action so as to cut off any interest in the Property she might claim arising from her purported current ownership of the Property and her interest as a tenant in the Property under a 50 year, below market residential lease entered into between her and the former Zingarella Realty.

12. Thereafter, Debtor answered the Bank's Amended Complaint, asserting various wholly frivolous "affirmative defenses" and "counterclaims", all of which were dismissed in a Decision and Order of the Honorable Marcy Friedman dated July 23, 2009 (<u>see</u> Exhibit C hereto).

13. In addition, by Order dated January 14, 2008, the court in the Foreclosure Action appointed Linda Rzesniowicki as Receiver for the mortgaged premises. Since such time, Debtor has repeatedly ignored and violated such Receivership Order, and various subsequent Orders and directives issued in the Foreclosure Action, by refusing to provide the Receiver with access to the Property, refusing to cooperate in any way with respect to the turnover to the Receiver of rents, security deposits, leases and other documents relating to the Property, refusing to pay "use and occupancy" to the Receiver for Debtor's purported use of the large commercial space at the Property, and otherwise blocking the Receiver's ability to manage and lease the Property and to otherwise fulfill her responsibilities at every step of the way. This has necessitated two separate contempt proceedings brought by the Receiver against Debtor, in which Judge Friedman repeatedly provided Debtor with one opportunity after the next to cure her contempt of court, all to no avail (see Exhibit D hereto, Receiver's Affidavit recounting selected examples of Debtor's misconduct).[2]

---

[2] By the way of example only, among the many shenanigans engaged in by Deb6tor, Debtor originally claimed, for many months, that she and her son were occupying the entire Property – three residential apartments and a large commercial space – and that there were no tenants, leases or rents to turn over to the Receiver. When the Receiver sought to obtain "use and occupancy" payments from the Debtor for her use of the commercial space at the Property, Debtor suddenly came up with a purported "commercial lease" between her, as landlord, and her own purported corporation, as tenant, for a fifteen year term at a monthly rent of $2,000 a year, with a $500 increase every five years – a mere fraction of actual market rent for such commercial space. When the Receiver pointed out that the purported lease was dated three months after the date it was produced to her, and two years after its term was to commence, Debtor's attorney responded that this was a typographical error, and produced a revised lease which simply back-dated its date, by handwritten revision, to the date it was suppose to take effect (see, Exhibit D hereto). As stated by the Receiver to the state court, her opinion is that such purported lease is a "fraud," which was created out of thin air in an effort to defeat the Receiver's attempts to get rent and/or use and occupancy for the commercial premises (see, Exhibit D hereto, at Pages 3-6).

14. Over three years after the Foreclosure Action was commenced, Judge Friedman finally signed a Judgment of Foreclosure and Sale, in which the Bank was awarded $5,806,081.90, upon which interest has been running since March 26, 2010, plus costs to be calculated by the Judgment Clerk (see, Exhibit E annexed hereto). On October 7, 2010, the very same day that the Bank was attempting to have the Judgment Clerk calculate the Bill of Costs and enter said Judgment, Debtor filed this bankruptcy case, thus staying entry of the Judgment and the foreclosure sale of the Property.

15. This bankruptcy case was also filed two weeks before October 21, 2010, the final hearing date set by Judge Friedman in connection with the Receiver's second contempt proceeding, at which it was anticipated that debtor would finally be punished for her continuing and willful contempt of repeated Orders of the New York State Supreme Court if she did not give the Receiver access to the Property on October 12, 2010 (see Exhibit F hereto, transcript of contempt hearing before Judge Friedman held October 7, 2010, the date Debtor filed this bankruptcy case).[3]

---

[3] This was the fourth or fifth chance Judge Friedman gave to Debtor to provide access. Debtor's prior reasons for her non-compliance with Judge Friedman's directives included her dog dying, illness and stress, being out-of-state on the pre-scheduled date for access, and so forth and so on. Upon information and belief, on one occasion when the Receiver or her managing agent went to the premises with a locksmith, Debtor called the police and attempted to have them arrested. On another occasion when the Receiver or her managing agent went to the premises with a locksmith, Debtor had installed some type of metal bar across the inside of the front door, which could only be removed from the inside. According to various reports from the Receiver, Debtor has literally barricaded herself into this Property.

## DEBTOR'S PURPORTED OWNERSHIP OF THE PROPERTY

16. The circumstances upon which Debtor claims to have obtained title to the Property are also extremely suspect, if not outright fraudulent. Specifically, on May 30, 2007, <u>after</u> the Bank's Mortgages had already gone into default, Debtor's son, Mr. Quantano, commenced an action for "specific performance" of a purported Contract of Sale for the Property, allegedly entered into between him and Zingarella Realty on February 1, 2002 – <u>over five years</u> before such action was commenced (<u>see</u> Exhibit G hereto). Mr. Quantano's complaint requests that Zingarella be compelled to deliver title to the Property to him upon payment of the balance due under the Contract (<u>Id.</u>). Apparently, Mr. Quantano kept such Contract of Sale in his back pocket for over five years, after allegedly paying a down payment of $100,000 upon execution of the Contract, before deciding that he wanted to close on the purported sale of the Property.

17. On September 20, 2007, Mr. Quantano was somehow able to obtain a "default judgment" for specific performance, due to Zingarella Realty's alleged default in appearing in the action. Said judgment directed Zingarella Realty to "specifically perform" the Contract of Sale by attending a "closing" on the contract on October 25, 2007, at which it was directed to execute and deliver to Mr. Quantano a bargain and sale deed for the Property (<u>see</u> Exhibit H hereto).

18. Thereafter, when Zingarella Realty supposedly failed to "appear" at such closing, Mr. Quantano was able to obtain an <u>ex parte</u> Order from the court directing the Sheriff to transfer the deed to the Property to him in the name of defendant Zingarella (<u>see</u> Exhibit I hereto). The resulting Sheriff's Deed transferring title to the Property to Mr. Quantano, for no further consideration, was signed on November 8, 2007 and recorded on December 13, 2007 – long after the Bank's

Foreclosure Action had already commenced (see Exhibit J hereto). On January 14, 2008, Mr. Quantano then transferred the deed to the property from himself to Debtor, again for no consideration (see Exhibit K annexed hereto).

19. Of course, the Bank had no knowledge that Zingarella Realty had purportedly contracted to sell the Property to Paul Quantano back in 2002. It did not learn of the purported transaction with Quantano until after Quantano was able to successfully obtain a default judgment of specific performance in 2007. In fact, in connection with its due diligence on both the 2003 Mortgage and the 2004 Mortgage, the Bank obtained opinion letters from Zingarella Realty's counsel which expressly represented that execution of said Mortgages did not violate, conflict with or result in a breach of any other contract to which Zingarella was a party, and did not violate any existing statute, rule or regulation (see Exhibit L hereto).

20. On May 8, 2008, after obtaining title to the Property, Debtor, and her son Mr. Quantano, filed a complaint against Zingarella Realty and its principals, as well as others, to void certain junior mortgages placed on the Property in favor of Park National Capital Funding LLC. In such action, Debtor acknowledge, among other things, that she took title to the Property subject to the Bank's Mortgages and that she, "...will be required to pay Banco Popular North America substantial sums to satisfy its mortgage and compelled to incur legal fees in an attempt to cancel the mortgages held by Park National Capital Funding LLC" (see Exhibit M hereto, at ¶ 18). It should be emphasized that in such action the defendant Romeo Salta, a principal of Zingarella Realty, filed a Verified Answer with Counterclaims in which he alleged that the purported Contract of Sale

between Zingarella and Quantano was fraudulent, and that the Debtor and her son Quantano had conspired with his partner in Zingarella, James Gomez, to defraud Zingarella by taking a signature page from another contract bearing the signature of Romeo Salta and attaching it as the last page to the purported Contract of Sale of the mortgaged premises to Quantano (see Exhibit N hereto).

21. Of course, neither Debtor nor her son ever paid the "balance due" under the purported Contract of Sale. Incredibly, Debtor and her son have obtained title to a multi-million dollar property, possibly through fraud, for a fraction of its cost. Under the 2002 Contract of Sale Quantano supposedly made a down payment of $100,000 against the purchase price of $4,000,000. Debtor's Verified Answer in the Foreclosure Action alleged there was a down payment of $400,000. Her subsequent Affidavit in support of her motion to dismiss the Foreclosure Action alleged $450,000. Quantano's complaint in his action for specific performance alleged $500,000, despite attaching the purported Contract of Sale which only recites $100,000 (see Exhibit G). Of course, no cancelled check or other evidence of actual payment has ever been produced by Debtor or Quantano.

22. In sum, although whether Debtor is the legitimate owner of this Property is not an issue before this Court, there is no question that the Property is subject to the Bank's Mortgages. Debtor herself has no personal liability to the Bank, having never signed a note in its favor or assumed the Mortgages here at issue, and she would not be liable to the Bank for a deficiency judgment in the event the proceeds from a foreclosure sale of the Property were insufficient to satisfying the debt owed under the 2003 Note and the 2004 Note. This is not a debt which is owed by the Debtor to the Bank.

## RELIEF FROM THE AUTOMATIC STAY SHOULD BE GRANTED
## PURSUANT TO BANKRUPTCY CODE § 362(d)(1) AND/OR (d)(2)

23. Bankruptcy Code § 362(d) sets forth the following two separate grounds for granting relief from the automatic stay:

> "(1) for cause, including the lack of adequate protection of an interest in property of such party in interest;
> (2) with respect to a stay of an act against property under subsection (a) of this section, if --
> (A) the debtor does not have an equity in such property; and
> (B) such property is not necessary to an effective reorganization."

24. In the case at bar, the total amount of the Judgment of Foreclosure and Sale entered against Debtor is $5,806,081.90, on which total amount interest has been accruing since March 26, 2010 at the rate in the 2003 Note and 2004 Note.

25. In addition, as confirmed in Debtor's own Schedules filed in this case, the Property is burdened by a third mortgage of $400,000 and secured tax and water liens of $78,000. It is well-settled law that all liens, including those senior and junior to the movant's lien, are to be considered in determining whether the Debtor has any equity in the property at issue. See, e.g., In re Indian Palms Associates Ltd., 61 F.3d 197, 34 C.B.C.2d 79 (3d Cir. 1995).

26. An appraisal of the Property obtained by the Bank at the time it extended the

loan concludes that as of July 30, 2003, the Property had a fair market value of $5,550,000.00 (Exhibit O hereto). The most recent appraisal of the Property obtained by the Bank during the course of the Foreclosure Action, concludes that the fair market value of the Property as of July 8, 2010 had declined to $4,000,000.00 (Exhibit P hereto).[4]

27. Accordingly, the current amount of all liens on the Property, which is at least $6,500,000.00, far exceeds its current value, and Debtor has no equity in the Property.

28. As set forth in Dreher, Bankruptcy Law Manual, Vol. 2, Section 11A:33, at p. 11A-93:

> "It is well settled that lack of adequate protection warranting relief from stay exists where the value of collateral is declining causing an erosion in the secured claim of the moving party [citations omitted]. Thus, if collateral is depreciating below the amount of the secured claim ... relief from stay will be granted ..." (citing to various authorities, including In re Elmira Litho Inc., 174 B.R. 892, 902 (Bankr. S.D.N.Y. 1994).

See also, Id., at Vol. 1, Section 2:8, at p. 2-70 (" ... cause [under Bankruptcy Code § 362(d)(1)] may exist if a secured party shows that the secured claim is depreciating in value and the debtor has made no offer to adequately protect against such depreciation [citations omitted]".

29. As set forth above, the Bank's collateral has been depreciating and continues

---

[4]Exhibits O and P consist of the summary pages of said appraisals, since the complete appraisals are rather voluminous. A copy of the complete appraisals is available for submission if deemed necessary by the Court.

to depreciate far below the amount of its secured claim, thus constituting "cause" under Bankruptcy Code § 362(d)(1) and warranting relief from the automatic stay. There is no question that Debtor has made no attempts whatsoever to adequately protect against such depreciation. Debtor has never made or even tendered a single mortgage payment since the filing of its Chapter 11 bankruptcy case in October of 2010.

30. The courts have also found "cause" warranting relief from the automatic stay under Bankruptcy Code § 362(d)(1) where the bankruptcy case is filed in "bad faith". See, Id., Vol. I, Section 2:8 at pp. 2-70 to 2-71 (and cases cited therein). Many of the same factors that go into a determination of bad faith for purposes of lifting the stay also apply to a finding of "bad faith" warranting dismissal of the bankruptcy case under Bankruptcy Code § 1112 (b). The Court is accordingly referred to the discussion of bad faith filings set forth below in connection with the alternative relief of dismissal sought in this application.

31. Finally, the separate ground for relief from the automatic stay set forth under Bankruptcy Code § 361(d)(2) is also here applicable. It is respectfully submitted that the Bank has established that the Debtor has no equity in the Property. In addition, the Property is not necessary to an effective reorganization.

32. The United States Supreme Court has held that the second prong of the test for relief from the stay under Bankruptcy Code § 362(d)(2) requires, " ... not merely a showing that

if there is conceivably to be an effective reorganization this property will be needed for it; but that the property is essential for an effective reorganization that is in prospect. This means ... that there must be a reasonable possibility for a successful reorganization, within a reasonable time." See, United Savings Association of Texas v. Timbers of Inwood Forest Associates Ltd., 484 U.S.365, 376 (1988). See, also, In re Kaplan Breslaw Ash. LLC, 264 B.R. 309, 322 (Bankr. S.D.N.Y. 2001) (warehouse was not necessary to effective reorganization because Chapter 11 debtor did not show reorganization was possible, let along reasonably likely within a reasonable period of time).

33. Under the circumstances of this case, it is inconceivable that Debtor can confirm a plan of reorganization at all, let alone within a reasonable time. The Property consists of a small commercial building, which has not generated any income for several years now. According to Debtor's own Statement of Current Monthly Income filed in this case, Debtor's only income derives from her antiques business, which she claims generates income, after ordinary business expenses, of $4,500 per month.

34. Nor has Debtor filed a Local Rule 1007-4 Affidavit, or any other submissions in this case, setting forth any detail whatsoever as to how the Debtor intends or envisions to reorganize her business affairs, or what steps she is taking towards such end. Bankruptcy Code § 362(g) provides that the burden of proof to establish that the property at issue is necessary for an effective reorganization is upon the debtor.

35. In sum, in view of the very large debt owed to the Bank and to the second

mortgagee of the Property, as well as substantial unpaid taxes and water charges which are and will be additional liens against the Property, and in view of the much lower and continually decreasing fair market value of the Property, there is no reasonable possibility of reorganization in this case.

## DEBTOR'S BANKRUPTCY CASE SHOULD BE
## DISMISSED PURSUANT TO BANKRUPTCY CODE § 1112(b)

36. As set forth above, a "bad faith" bankruptcy filing has been held to constitute "cause" warranting relief from the automatic stay under Bankruptcy Code § 362(d)(1). In addition, the same finding of "bad faith" has also been held to warrant, in the alternative, dismissal of the bankruptcy case pursuant to the Bankruptcy Code § 1112(b). See, Bankruptcy Law Manual, supra, Vol. 2, § 11A:48, at pp. 11A-135 to 11A-140 (and extensive cases cited therein). Thus, in addition to the grounds for dismissal specifically enumerated under Bankruptcy Code § 1112(b)(4), the courts have long recognized that dismissal "for cause" is also warranted where a bankruptcy case is filed in bad faith. As in many of the cases where a bankruptcy case is dismissed for bad faith, the case at bar is essentially a single-asset real estate case involving a two-party dispute between Debtor and the Bank attempting to foreclose on a parcel of commercial real estate.[5]

37. In the case at bar, it is respectfully submitted that Debtor's filing of her bankruptcy case on the verge of a foreclosure sale of her real estate asset, taken together with

---

[5] Besides the Property, the only other assets listed by Debtor in her Schedules are approximately $11,000 in cash and other personal property, and her interest in a 100% owned corporation, which she values at $50,000.

Debtor's conduct prior to and following such bankruptcy filing, constitutes "bad faith", warranting dismissal of this bankruptcy case.

38. Although some courts have held that filing for bankruptcy on the eve of a foreclosure sale or other impending loss does not by itself automatically constitute bad faith, said courts also hold that dismissal (or relief from the stay) may be warranted in such cases based on a totality of the circumstances, including the attempt to evade pre-petition orders or warrants issued by a non-bankruptcy court. See, e.g., In re Syndicom Corp., 268 B.R. 26, 47 (Bankr. S.D.N.Y. 2001).

39. Thus in In re MacInnis, 235 B.R. 255, 260 (S.D.N.Y. 1998), a case directly on point, the court held that: "Numerous courts have found bad faith where a debtor possessing a single asset has no realistic chance for rehabilitation of any ongoing business and files a bankruptcy petition in the hope of gaining relief from another action that essentially involves the resolution of a two-party dispute." See also, In re Trident Associates Ltd. Partnership, 52 F.3d 127 (6th Cir. 1995) (debtor with no ongoing business or employees, and with only one asset that was being foreclosed upon, should have case dismissed as filed in bad faith); In re C-TC 9th Avenue Partnership, 113 F.3d 1304, 1310 (2d Cir. 1997) (court dismissed case of single asset real estate partnership that was subject to foreclosure action, with few unsecured creditors, "When it is clear that, from the date of filing, the debtor has no reasonable probability of emerging from the bankruptcy proceeding and no realistic chance of reorganizing"); In re Kaplan Breslaw Ash, LLC, 264 B.R. 309 (Bankr. S.D.N.Y. 2001) (bad faith found where petition was filed on eve of mortgage foreclosure, debtor had no

employees, no income with which to reorganize, no or few unsecured creditors who would profit from reorganization, and intent was to halt foreclosure and bring two-party dispute to Bankruptcy Court).

40. Similarly, in In re McGovern, 297 B.R. 650 (S.D. Fla., 2003) the court held that a Chapter 13 Plan was not proposed in good faith where the debtor was liable for judgment and the totality of the circumstances indicated that debtor's motivation in proceeding under Chapter 13 was debt avoidance, not debt relief, such that debtor lacked the requisite good faith. In general, the courts have engaged in a multi-faceted "totality of the circumstances" analysis to determine what constitutes bad faith, focusing primarily on the debtor's motivation in seeking bankruptcy relief, and on both the debtor's pre-filing and post-filing activities. See generally, Dreher, Bankruptcy Law Manual, 5th Ed., §§ 13-15 (and discussion of extensive cases cited therein). Among the specific factors considered by the courts in determining the absence of good faith, the courts have dismissed cases based on the frequency with which the debtor has sought bankruptcy relief, the motivation and sincerity of the debtor in seeking bankruptcy relief, and whether the debtor is attempting to abuse the spirit of the Bankruptcy Code. Id., at pp. 13-89 to 13-93.

41. In addition, numerous factors enumerated under Bankruptcy Code § 1112(b)(4) also apply to the case at bar, including without limitation the following provisions of the statute:

> "(A) substantial or continuing loss to or diminution of
> the estate and the absence of a reasonable likelihood of
> rehabilitation ... (F) unexcused failure to satisfy timely

> any filing or reporting requirement established by Title 11 or by any rule applicable to a case under the Bankruptcy Code; (G) failure to attend the meeting of creditors convened under Section 341 (a)."

42. The continuing loss to or diminution of the value of the estate, and the absence of any reasonable likelihood of rehabilitation, has already been set forth and established in detail above.

43. Similarly, Debtor has repeatedly failed to comply with numerous filing and other requirements of a Chapter 11 bankruptcy case. Among other things, and without limitation, Debtor initially failed to file numerous documents, and obtained extension to October 21, 2010. Notwithstanding, Debtor has still failed to file a Statement of Financial Affairs, a Certificate of Debtor, Directors Procedural Form B201, tax returns, and pay stubs, payment advices on other evidence of payment.

44. In addition, Debtor has never filed a Monthly Operating Report since this bankruptcy case was filed. In addition, there is nothing on the Court's docket sheet indicating that an Initial Case Conference was either requested or attended by Debtor, as required by the local bankruptcy rules.

45. Similarly, although a notice of a Section 341 meeting of creditors was issued and mailed, it does not appear from the Court's docket sheet that any such meeting of creditors was

actually held, let alone concluded, on its scheduled date of November 20, 2009. This in itself constitutes "cause" for dismissal under Bankruptcy Code § 1112(b)(4)(G).

46. In addition, Debtor has never offered to provide the Bank with any adequate protection against the continually declining value of its collateral, or even contacted the Bank to discuss her intentions with respect to a purported reorganization of her finances. Nor has Debtor set forth in a Local Rule 1007-4 Affidavit or anywhere else in any of her filings, what steps she is taking or intends to take to rehabilitate herself, and how she intends to reorganize and repay her secured creditors through a viable plan.

47. It is respectfully submitted that in view of the above, Debtor's bankruptcy case is clearly a bad faith filing, intended solely for the purpose of frustrating the orderly foreclosure sale of the Property, and without a legitimate intent or viable means of reorganizing. Debtor has already failed to comply with the Bankruptcy Code filing requirements in numerous respects, and is now engaged in delay tactics to drag out this bankruptcy case, and while reaping the benefits of the automatic stay under the Bankruptcy Code, for as long as possible.

48. This motion contains reference to applicable legal authority for the relief requested, and does not raise any novel issues of law. Accordingly, the movant respectfully requests that the requirements of E.D.N.Y. Local Rule 9013-1(b) that a separate memorandum of law accompany this motion by waived.

WHEREFORE, request is made that the Court issue an Order granting the relief sought herein, together with such other and further relief as the Court may deem proper.

Dated: New York, New York
   December 23, 2010

               SANKEL, SKURMAN & MC CARTIN, LLP
               Attorneys for Banco Popular North America

               /s/ Claudio Dessberg
               Claudio Dessberg (CD-0873)
               750 Third Avenue, 29th Floor
               New York, New York 10017
               (212) 682-2288

BancoPop\Zingarella\AppOrder.wpd